We'll turn now to NYU v. Factory Mutual Insurance Company, Mr. Flanders. May it please the court, Ed Flanders for Plaintiff Appellant, New York University. Focusing on the first issue raised in our appeal, which is the scope of the properties subject to the $40 million flood sub-sublimit, the District Court's ruling cannot be sustained. The District Court agreed that NYU had the better reading of the clause, and that is, in fact, correct. The policy, which was drafted by FM, provided that the addresses covered by the sub-sublimit ranged from, quote, 550 to 580 First Avenue, end quote. The three buildings that are the focus of this appeal, Smilow at 522 First Avenue, HCC at 530 First Avenue, and Skirball at 540 First Avenue, fall outside this address range. Under New York law, NYU should therefore have prevailed on the plain language that was drafted by FM itself. Moreover, the District Court compounded its error in not deferring to that plain language. In particular, the District Court committed, I would respectfully submit, three fundamental errors of law. First, if there was an ambiguity, it could not be resolved against NYU on summary judgment. Second, as this court is well aware, on summary judgment, parole evidence has to be construed in the light most favorable to NYU. The District Court did not do that, and instead resolved fact questions itself in the light most favorable to FM, instead of leaving them for trial. Third, and importantly, under New York law, the doctrine of contra preferentum required the District Court to resolve any ambiguity in the policy against FM, whereas here, the language was not conclusively resolved by the parole evidence. The District Court ignored this substantive law and did the opposite by resolving a purported ambiguity, not just against the plain language of the policy, but against the insured rather than the insurer responsible for drafting it. At a minimum, there was a triable issue of fact over the scope of the sub-sublimit, and it was error for the District Court to resolve that fact dispute instead of leaving it to a jury. Now, the District Court, after concluding that NYU had the better reading of that clause, nevertheless went to the schedule of locations to find an ambiguity. But even looking at the schedule of locations, it makes clear that the property description for the First Avenue side of the main campus is 500 to 584, not 550 to 580 First Avenue. Your first three minutes have expired. Thank you. I can stop here and take questions, Your Honors, or I can continue. Keep going. I've got some questions for you, but I want to hear your answer, the rest of what you had to say about the schedule. Sure. So, you know, that should have ended the inquiry without having to go to the extrinsic evidence because that made it clear that the parties did not intend 550 to 580 First Avenue to describe the entire First Avenue side of the main campus. Moreover, the and HCC at 530 First Avenue are not within the sub-sub limit at most. Can you clarify something? Can you clarify something for me? I take it that the schedule, Schedule A, which lists all these properties of NYU everywhere around the world, doesn't, is irrelevant to the sublimit question because all it says is these properties are insured, right? And it doesn't speak to the amounts. That's exactly right, Your Honor. I don't think that, I think that the district court could have and should have enforced the sub-sub limit without going to the schedule of locations to try to find that there might have been an ambiguity with respect to certain addresses. In fact, all of the prior policies specifically referenced the schedule of locations and specifically said index 21374 was the demarcation for the property subject to the sub-sub limit. In this policy at issue, yes, Your Honor. I understand the index arguments you're making, but my question goes to the actual language of the sublimit text that we're talking about here. It says a flood sublimit applies to property located at the NYU Hospital Center and School of Medicine, located at 550 to 581st Avenue. Now, if it had just simply stopped at NYU Hospital Center and School of Medicine, I think we'd be talking about the super block, I think. And then there would be a complete, you know, the sub, the $40 million would apply to all those 10 buildings or 15 buildings. But you make the point that 550 to 580 is a subset within the School of Medicine and Hospital Center. And these three buildings do not fall within those addresses. My question is, if you possible to read this as saying, and this is your adversary's argument, that the School of Medicine is, there are lots of schools of medicine, there are lots of hospitals that NYU has. They're talking about the one down on the lower, you know, in the area of 34th and 30th Street, the 550 to 580 1st Avenue, that it's just simply an address that indicates where you would go to school of medicine that they're talking about, as opposed to a delineation of specific properties that would or that would not be covered. Because it does say property located at at the center. It doesn't say property located at the center, but only properties that relate to 550 to 580 and exclude other properties. Well, Your Honor, if they stop at NYU Hospital Center and School of Medicine, then that would encompass properties all around the metropolitan area. There would be no certainly limit that to the... That kind of makes my point. They're talking about the conglomeration of buildings in the lower 30s on the east side and that are in the pictures in the briefs. And why doesn't 550 to 580 just simply say, oh yeah, that's the property we're talking about. We're not talking about anything up in the upper east side or on the west side or anywhere else in Manhattan or anywhere else in the world. That's just it. We just have that use, serve the use of telling you which center they're talking about. Well, Your Honor, but the center is not at 550 to 580 First Avenue. When you look at the schedule of locations, the NYU School of Medicine and the hospital center is described as 500 to 584 First Avenue. So if they wanted to... It's located at 550 to 580 for sure. I mean, that's not... It's located there, but you could view it possibly as a language that is just referring to that particular center. I'm not saying that that's an ironclad meaning at all. I'm just saying that maybe there's an ambiguity there. Well, I think that it's certainly... Let me put it this way, Your Honor. Why in the world, if they meant to include the entire First Avenue side of the superblock, would you use 550 to 580 First Avenue instead of 500 to 584 First Avenue? What do they use in their schedule of locations? And why would you take... Yes, Your Honor. Mr. Flanders, let me ask you this. This is Judge Wesley. You would agree with me that prior to this policy, they had indeed described the entire block, had they not? Because they used the index number, right? They did, yes. And that was very... And so they... And I understand. I've been through some of these insurance cases before. So... And so they then changed the description in your mind. You make an argument. And Judge Walker's raised with you the prospect that there might be an ambiguity when there's a reference to a property located at the NYU Hospital Center and School of Medicine. And that is inconsistent with your view of the description of 550 to 581st Avenue, correct? Correct. Okay. So would you concede that there's an ambiguity between those two descriptions as to what the intention is? No, I would say that FM knew exactly... You would not? I would say FM knew exactly what it was doing. Okay. Let's explore that. Let's explore that for a second. What in the record shows that there was a... Did you ask for a reduction or an increase in coverage with regard to those three buildings in your negotiation of the coverage of those three buildings for the policy year that's in question? No. NYU and... No. Your Honor. Answer the question. Did you negotiate or was there a negotiation of an increase in the sublimit of flood coverage for those three buildings in the year covered by this policy? There was a request, Your Honor, for an increased amount of coverage for the entire index 21374, which included those three buildings. And in your... That was only... Was there an increase... Was there an increase... Was there an increase of $10 million? Yeah. Correct. It was an increase of only $10 million, right? You didn't answer $210 million, did you? Well, actually, we asked for as much as they were willing to give. We asked for a quote above $50 million. Did you pay a higher premium? We did. Did you pay a higher premium? Absolutely. The 2011 premium for the policy was $1 million more than the 2010 policy. And so the sublimit premium stayed the same, but of course it did because you took buildings out of the sub-sublimit. So the $450,000 sub-sublimit wouldn't increase that. The $250 million limit is governed by the overall policy premium, which increased by $1 million. Okay. And I would also have something to say about that, but okay. Fair enough. Your position is that this is not ambiguous. The other side is also taking the position that it's not ambiguous. But even if it is, the negotiating history and the extrinsic evidence cuts in their favor the way the district judge found. But it seems to me that reasonable people can look at this and be confused as to what is meant by where the coverage is aimed at, because it talks about property located at the center, and then it talks about the center located at. It doesn't talk about property located at, arguably. I mean, you could read it that way, but it's not a compelled reading. And I take the point, Your Honor. And if there's an ambiguity, then it could not have been resolved against NYU on summary judgment. On summary judgment, the evidence... Why couldn't it? If there was no... Why couldn't it, if you look at the contract as a whole, and the only way to understand the ambiguity is to interpret it one way? Well, I would say then, if you're going to look at the contract as a whole, and you look at the schedule of locations, it makes crystal clear that FM did not intend 550 to 581st Avenue to all of the First Avenue buildings on the main campus. That's crystal clear. If that is what their intent was, they would have used 500 to 584 First Avenue, and they would have used the index number. Yeah, but you're looking at just one aspect of the whole history of this. There was even an understanding at all prior to this lawsuit, prior to the claims here, that the entire superblock was covered. And there were admissions from your side to that effect, subject to the limit. So the judge looked at the negotiating history, but she actually came to the conclusion that no reasonable jury could find in your favor based on that history. And she was entitled to do that if, in fact, you rule as a matter of law on summary judgment, because you have that kind of a lineup of the evidence. But I suppose you're saying that your evidence, including the getting rid of the index number and not having the right addresses and all that, creates enough that at least it should have gone to a jury. I think so, your honor. And on top of that, the jury is entitled to then, if the evidence is not conclusive in FM's favor, then the doctrine of contra preferentum comes into play. And there's no dispute that this was a standard form FM policy that FM drafted. And so I think that that's a... No, I understand that argument. I understand that, but I have another question. There are cases, old cases to be sure, in which as soon as there's an ambiguity, you apply contra preferentum without looking at the extrinsic evidence. Or there are other cases that say you use contra preferentum as a last resort. Which is it? Well, your honor, I will concede that there are cases that go both ways. I think the more recent decisions of the Second Circuit, though, including but not limited to the Morgan Stanley case, make it pretty clear that if there is extrinsic evidence, then that has to go to trial. And then if the evidence is not conclusive in demonstrating that the insurer's interpretation is the correct one, at that point, the district court is to apply the doctrine of contra preferentum. And at a minimum, that's one of the things that should have happened here, in addition to not ruling on ambiguities in favor of FM, and certainly not on summary judgment drawing inferences most favorable to FM, the movant. And I think there's one piece of evidence, your honor, though, I think really speaks to the issue. When NYU purchased excess flood insurance, it relied on the 550 to 580 First Avenue description. So it only purchased excess flood insurance for those properties. It did not purchase excess flood insurance for Smilow, because that's 522 First Avenue, or HCC, because that's 530 First Avenue. That is, I would say, the best evidence of what a reasonable insured would understand that language, 550 to 581st Avenue. And that is Marsh, who is the one that dealt with FM. And they looked at it, they read it, they gave the meaning to the words that were specified. If they thought that the entire main campus was covered, they would have bought excess flood insurance for the entire main campus. They didn't. And I think that is very strong evidence. And at a minimum, that evidence would have to go to a jury. Okay. Thank you. Can you move over to the alternative, additional coverages question? There's language in the policy that says limits of liability in an occurrence, and I think we're talking about this, in this case, the flood, in an occurrence, apply to the total loss or damage at all locations and for all coverages involved. Why does the term for all coverages involved apply to the additional coverages? And therefore, the limits of liability for the occurrence of the 40 million would apply to the additional coverages. Well, it doesn't say, like the cases that FM relies upon, when the limit of for the peril of flood applies, then that's the maximum amount that FM will pay. And in fact, it says limits of liability. It doesn't say when the limit of liability for the peril of flood in an occurrence applies, that is the maximum amount that FM will pay regardless of the number of locations and for all coverages involved. You know, why did they use the plural limits of liability? And on top of that, the occurrence here was Superstorm Sandy. The additional coverages cover things like protection and preservation of property before there's even a flood. It also, it covers emergency vacating expense. The district court assumed that all the losses covered by the additional coverages were caused by flood without any discovery on that issue because discovery of the damages and causation was stayed. I see. Okay. Okay. I think it's time to hear from Ms. Koberly. Good afternoon, your honors, and may it please the court. This is a contract case, and what matters is the intent of the parties. As you've already heard, in prior years, the parties agreed that this sublimit applied to the entire medical center complex. In 2011, NYU asked its broker to negotiate higher flood limits for the medical center complex as a whole, but the broker wrote back and said that FM Global had refused. Now that there's been a loss, though, NYU is trying to take advantage of a technical change in the language, the deletion of the index number, to say that the broker was able to get more coverage after all. There is no evidence that that is what the parties intended. The policy language does not require their reading. It uses exactly the same name and addresses and located at language as it did in 2010 when everyone agrees that it applied to the medical center as a whole. To adopt NYU's reading, the court would have to ignore the history, read out an entire clause of the agreement, and assume the parties meant to carve up a property they had always previously treated as a single unit. In fact, the court would have to assume that the parties meant to carve up a single building, the Skirball building, within the only possible one. And the extrinsic evidence shows conclusively that NYU's reading is not what the parties intended. NYU concedes in its reply and conceded an argument today that it never suggested carving those three buildings out. It asked for expanded coverage for the entire medical center and now says that their broker succeeded in getting it. But the broker said at the time that that didn't happen. His letter transmitting the final policy says that FM Global had elected to renew at the expiring limits. It was unable to provide additional coverage for flood and the limits would, quote, remain, close quote, the same. The broker also made clear that the parties didn't intend the removal of the index number to change the scope of the sublimit from to the letter still refers to the sublimit by using the index number. That's at page 188 of the confidential appendix. There was only one possible conclusion for the jury to reach here. And that is that the parties did not agree to change the flood sublimit and they did not intend the removal of the index number to give NYU dramatically more coverage without paying for it. Now, aren't you actually making an argument here that sort of skips the whole the whole idea of the fact that you're supposed to take the language first and see if it's unambiguous and then that ends the case. You're in effect saying that the language, the lack of ambiguity in this case is due to all the negotiating history and the way the policy was treated in the past and so forth. In other words, you're using extrinsic evidence up front. And I'm just not sure whether that's the right way to look at this case. Well, if you begin with the language itself, and we do that in our brief and the district court did it below, we conclude that the language is unambiguous and we've explained why in our brief. And that's because of the construction of the language using the two located at clauses. It refers to property located at the NYU Hospital Center and School of Medicine, which is located at 550 to 581st Avenue. There is no dispute that the entire superblock is located at 550 to 581st Avenue. Now, it also happens to be located at other street addresses, including 500 to 550 and 580 to 584. But it is certainly located at those, that range, and there's nothing in that clause that suggests that that address range should be read literally and exhaustively as if it were the only thing in the sublimits. So we do think that the language on its face is clear. But if you were to conclude... The district court didn't, the district That's correct. That's right. And she did it largely based on the schedule and basically steerball. She did. She found ambiguity. And then, but she found all the negotiating history and extrinsic evidence lined up on your side, primarily. That's right. That's right, Your Honor. And a finding, we know from this court's case, this court's decision in the company financier case, that a finding of ambiguity doesn't preclude summary judgment. If the extrinsic evidence is so one-sided that no reasonable jury could disagree, then the case should be resolved on summary judgment. And of course, contra preferentum, as you heard counsel concede, applies when extrinsic evidence sheds no light and is not conclusive. And here, the extrinsic evidence is conclusive. I've spoken about the transmittal letter. It is a very compelling piece of evidence. On the first page, it includes the language I mentioned a moment ago. In the summary, it still uses the index number to refer to the sublimit. And one very important thing about that transmittal letter is what it doesn't say. It's a very extended analysis of all the changes in the 2011 policy. And it includes things like, we've changed a heading, or there's a typo. And what it doesn't say anywhere is that this medical center that had been treated as a unit for years is now for the first time being subdivided. That is referenced nowhere in that transmittal letter. And then you also have the party's course of conduct. I mean, counsel mentioned the issue of NYU not purchasing excess insurance for those three buildings. Well, at best, that is an uncommunicated subjective intent that wouldn't support NYU's own reading of the contract. Compare that, though, with the communications between FM Global and NYU in 2011 and 2012. During that period, FM Global prepared engineering reports that said on the cover, NYU Medical Center 550 to 580 First Avenue. And then those field reports proceeded to include a discussion of Skirball and Smilo and HCC because they are part of that NYU Medical Center. And for that, if you could look at confidential appendix 596 and 912, that's the 550 to 580 First Avenue. So in the face of that evidence, it is clear that the parties continued to understand the language 550 to 580 to include the entire medical center complex. The court mentioned the premium issue, and I do have something to say about that. It is not true. It is not factually true, according to the documents, that the premium for 2011 was a million dollars more for the overall policy than it was in 2010. The 2010 policy actually included a credit of some 700 and some thousand dollars. So the actual difference in premium between the two years is in the hundreds of thousands of dollars, not a million. Also, NYU hasn't cited a single document, either within NYU or within FM Global, no document at all, that connects that increase in policy to a change in the flood sublimit, the exclusion of these three buildings. And our expert testified or submitted a declaration testifying that the actual cost of the expanded coverage would have been a lot more than that if, in fact, you had taken the building that is closest, the closest building of all to the East River, and excluded it from the flood sublimit. So the premium did not increase by a million dollars, and any increase in the premium has never been linked to the exclusion from the sublimit. So the question for the court was really how the extrinsic evidence squared with NYU's version of the facts. And again, according to NYU, FM refused to increase the sublimit for flood, as requested by NYU, but instead decided on its own to remove two and a half buildings from the sublimit, carving up a property the parties had always treated as a single location. And it did so without ever saying so expressly, either in internal documents, or in the communications, or in the summary that described all the changes to the policy. In the face of this extrinsic evidence, no reasonable jury would accept that story. The district court was right to grant summary judgment, and we submit that the order should be affirmed. What about the additional point a minute ago that I thought that the language in the policy was that the limits of liability would, for an occurrence, would apply to the total loss of damages in all locations and for all coverages, as encompassing the additional coverages? I take it that's your position? Yes, yes, that's right. So in the occurrence, as defined in the policy, is the total of all loss or damage arising of or caused by one discrete event, which here, of course, is the flood. That language would reach any occurrence, right? I mean, it wouldn't be just a flood, obviously. There could be other occurrences, you know, an earthquake or something of that sort. Correct. The limits, exactly. We're talking about any kind of occurrence, and here the occurrence happened to be flood, but that lead in language to the limits of liability, and it uses plural, by the way, because it's immediately followed by a long chart that includes all the different limits of liability of which flood is one. So that's why it uses the plural. But the limits of the liability in occurrence here, this flood event, applies to not only damage at all locations, but also for all coverages involved. So we think that language is quite explicit and resolves this issue. Thank you, Ms. Coble. Mr. Flanders, you reserve three minutes. Yes, thank you, Your Honor. So I want to talk about the transmittal letter that was written by Ian Anderson. Ian Anderson testified that before he sent that transmittal letter, when he got the policy, he noticed that the index number was removed. He called his counterpart, Tom Tarzali, and said, I see that you have removed the index number, and tell me why it is that you did that, because he's trying to find out what FM intended by that. Mr. Tarzali refused to explain it to him, and he says it is what it is. And so Mr. Anderson is put in a position of not knowing what FM's intent was in removing that index number. And in fact, FM's broker expert, who used to be an employee of Marsh, said that the broker should never stick his neck out and interpret a policy unless the underwriter confirms that his understanding is correct. Well, so what all Ian Anderson did was to say that he repeated the language in the policy, that FM refused to grant more in addition to $40 million for these properties, and he didn't specify the index number. And in any event, we know what Mr. Anderson understood, because subsequent to that, they went out to the excess markets, and they looked at the policy, and Marsh and Mr. Anderson concluded that the sub-sub limit only applied to 550 to 581st Avenue. And so in reliance on that, they only purchased flood insurance for those properties, which did not include Smilo, and did not include HCC. So if the parties all understood, like No, no, no, Mr. Anderson is the broker for Marsh. Yeah, but he doesn't work for FM, right? No, but... I'm trying to understand how something, Mr. Anderson's understanding of the agreement somehow binds FM, that's all. Because, Your Honor, what my point is, is that... His understanding, he's understanding what the agreement says, but it's not a representation of FM. I understood, but it certainly is a representation of what NYU understood. Okay. And I also just wanted to quickly address, why would FM carve out Smilo, HCC, and Skirball? Well, because it's undisputed that they had lower flood risk. And it is also undisputed that FM was trying to reduce its reinsurance costs. And it is also undisputed that FM identified index number 21374 as overly conservative. And so when FM went out to the reinsurance markets, it didn't include Smilo in the list of schedules. And in fact, it told the reinsurers, we want a reduction in our reinsurance rates. And we've gone through and done an engineering review, and several of the locations have dropped off. So it makes actually perfect sense. Notwithstanding the fact that they were now exposed by another $210 million? Well, because that is a completely different bucket. This is the reinsurance bucket. Yeah, I know, but the reinsurance is just standing in the shoes of the subsedent. So... No, no, the... Excuse me, if they're taking on a bigger risk, you'd think that the... Notwithstanding the fact that it's in a lower thing, that there might be some adjustment of costs, wouldn't you? Actually, the reinsurers... I don't understand the argument that you're making. So in any event, thank you. Can I make just one last point, Your Honor? The reinsurers were not insuring the properties covered by the flood sub limit. So when those properties get carved out into the 250, that's FM's bucket. FM has reserves to cover that. That's why the premium didn't go up for those properties, because FM was doing its own internal reinsurance, and that's why FM increased the premium by $1 million. And the record is clear. When you look at the invoices from Marsh, comparing 2010 to 2011, and you give credit for the credit, you will see that the policy went up by $1 million. And, Your Honor, I think I'm... I think that's it, Mr. Flanders. Thank you very much. Thank you, Your Honor. I appreciate it very much. Ms. Copley, Mr. Flanders, we'll reserve decision.